FILED
2022 Apr-22  PM 03:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **AVA THOMAS,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | |
| | ) | |
| **CHEROKEE-ETOWAH-DEKALB** | ) | **JURY DEMAND** |
| **FELLOWSHIP HOUSE, INC.,** | ) | |
| **ETOWAH-DEKALB-CHEROKEE** | ) | |
| **MENTAL HEALTH BOARD, INC.** | ) | |
| | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

**COMPLAINT**

## I.  INTRODUCTION

1.  Through this complaint, Ava Thomas ("Plaintiff") asserts federal claims of sex

discrimination in violation of the Fair Housing Act, 42 U.S.C. §3601, et seq.,

along with Alabama state law causes of action.  Plaintiff resided at Defendants'

home for the mentally ill while she received treatment designed to stabilize her

condition. A social worker provided counseling to Plaintiff as part of her

intensive treatment regime. During an evening when that social worker was

responsible for the residents' well-being, he gave Plaintiff her psychotropic

medication, went into her private room, and sexually assaulted her. Plaintiff had previously complained to managers at Defendants' facility about this social worker's inappropriate sexual behavior towards her. During the investigation into Plaintiff's complaint, that social worker did not deny his sexual encounter with Plaintiff; rather, he claimed their sexual encounter was consensual. While Plaintiff was undergoing treatment for her mental health, she lacked the capacity to consent to having sex with the social worker.  Defendants allowed this sexual assault on one of society's most vulnerable members – those like Plaintiff suffering from mental illness.

## II.     JURISDICTION

2.     The jurisdiction of this Court is invoked pursuant to secure protection for and redress deprivation of rights secured by The Fair Housing Act, 42 U.S.C. §3601, et seq.  Jurisdiction is invoked pursuant to 28 U.S.C. §§1331 and 1343(a)(3) . Jurisdiction over Plaintiff's state law causes of action exists under the doctrine of supplemental jurisdiction, 28 U.S.C. §1367(a).  Plaintiff is bringing this action within two years of the discriminatory housing practice . 42 U.S.C. § 3613(1)(B).

## III.    PARTIES

3.     Plaintiff, Ava Thomas, is over the age of 19 years. Plaintiff is an "aggrieved

person" as is defined by the Fair Housing Act, 42 U.S.C. §3602(I).

4.    Defendant Cherokee-Etowah-Dekalb Fellowship House, Inc. is an entity subject to suit under the Fair Housing Act, 42 U.S.C. §3602 and §3603.

5.    Defendant Etowah-Dekalb-Cherokee Mental Health Board, Inc. is an entity subject to suit under the Fair Housing Act, 42 U.S.C.§3602 and §3603.

6.    Plaintiff is a former resident of one of the Defendants' facilities called CED (Cherokee Etowah Dekalb) CMHC White/Parker Home Specialized located in Centre, Alabama where she lived and received mental health treatment.

## IV.   FACTUAL ALLEGATIONS

7.    In October 2020, Plaintiff was admitted to Gadsden Regional hospital for having debilitating mental health issues.

8.    After the hospitalization, Plaintiff transferred to a facility in Cullman, Alabama, where she received further treatment for her mental health for a couple of months.

9.    Around January 2021, Plaintiff was moved to a facility called CED (Cherokee Etowah Dekalb) CMHC White/Parker Home Specialized, located in Centre, Alabama for further treatment.

10.   The facility where Plaintiff was housed is subject to the FHA because it falls into the category of "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

42 U.S.C. § 3602(b). The FHA further provides that a "family includes a single

individual." Id. § 3602 (c).

11.    Defendants receive Federal funds to operate housing at the facility where Plaintiff

resided.

12.    According to their website cedmentalhealth.org, Defendants provides Adult

Residential Services as follows:

> CED Mental Health Center provides care and treatment in
> group home, foster home, and therapeutic home
> environment. The goal is to provide an opportunity for
> individuals to realize their fullest potential while being served
> in the least restrictive environment. Twenty-four hour care is
> provided to our residents.
> Living in a Residential or Foster Home provides a way for
> those with a mental illness to have an adjustment period
> while working toward more complete independent living.

13.    As part of her rehabilitation mental health therapy, Plaintiff regularly met with a

social worker employed by Defendants named Kenyatta Tyon Lee ("Mr. Lee")

with whom she shared difficult issues of her past including being molested and

raped.

14.    Mr. Lee began an unprofessional and inappropriate flirting relationship with

Plaintiff sometime in the summer of 2021.

15.    Mr. Lee regularly told Plaintiff how attractive she was and she should be with

someone who cared about her.

16.    Mr. Lee also pushed his groin up against Plaintiff when he had the opportunity to get very close to her, such as in the kitchen, or grab her.

17.    Mr. Lee reported to a supervisory social worker named Laura Leigh ("Ms.. Leigh").

18.    Ms. Leigh had noticed Mr. Lee's flirtatious relationship with Plaintiff and asked Plaintiff about it around late July 2021.

19.    Plaintiff told Ms. Leigh she was not flirting with Mr. Lee; rather, he was the one flirting with her, and that it was Mr. Lee who initiated the flirting on a constant and continuous basis.

20.    Ms. Leigh asked Plaintiff whether that was why he treated Plaintiff differently from the other residents, such as giving her a "hard time" and teasing her, and Plaintiff said yes.

21.    Plaintiff told Ms. Leigh she had a boyfriend and Mr. Lee made her uncomfortable by flirting with her and groping her.

22.    Plaintiff explained to Ms. Leigh that Mr. Lee would ask Plaintiff to help in in the kitchen and he would push his groin area up against her or grab her when she was cleaning.

23.    Ms. Leigh took no action to stop Mr. Lee from continuing to sexually harass Plaintiff.

24.   Mr. Lee told Plaintiff he would take care of her sexual needs if he were her
      boyfriend.

25.   On or around August 1, 2021, Mr. Lee was the only facility staff employee
      present at the White/Parker facility, and he was in charge of the residents,
      including Plaintiff.

26.   Mr. Lee dispensed an antipsychotic medication called Goeden to Plaintiff.  This
      medication is generally used to treat mental disorders such as schizophrenia,
      because it can decrease hallucinations and help clarify thought.

27.   The other residents had gone to bed, and Mr. Lee sat with Plaintiff in the main
      area watching a movie called Fifty Shades of Grey, which had a lot of sexual
      scenes in it.

28.   During this movie, Mr. Lee made sexual advances to Plaintiff and he told her he
      would have sex with her but he was scared to lose his job.

29.   Mr. Lee also told Plaintiff that evening that he had the ability to get her out earlier
      than her scheduled release date of March 2022.

30.   After the movie, Plaintiff went back to her room for the night and went to bed.

31.   Not too long after Plaintiff got into bed, Mr. Lee entered her room and shut the
      door behind him.

32.   Mr. Lee told Plaintiff that he wanted her to show him what she had done to the

technician in the hospital that they had discussed in one of Plaintiff's counseling sessions.

33. The incident Mr. Lee was referring concerned Plaintiff telling him how a Technician in the hospital had forced her to perform oral sex on him and he had then raped her, at a time when she was extremely vulnerable due to her unstable mental state while hospitalized.

34. Mr. Lee walked up and stoof beside Plaintiff's bed and pulled down his pants and underwear.

35. Plaintiff did as Mr. Lee had instructed her to do, and he held Plaintiff's head in place as she performed oral sex on him.

36. Lee knew Plaintiff lacked the capacity to refuse him and he took advantage of her emotional state as she had been discussing in their sessions how she was suffering from severe emotional distress, mental illness, and trauma.

37. Also, by giving Plaintiff her anti-psychotic medication shortly before he sexually assaulted her, Mr. Lee further reduced her capacity to refuse his sexual demands.

38. And finally, Mr. Lee had just told Plaintiff he had the ability to get her out of the facility earlier than her originally scheduled release date and Plaintiff did not want to anger Mr. Lee to prevent him from taking action to hold her there longer.

39. Plaintiff did not have the capacity to consent to a sexual encounter, as she was

medicated and struggling with recovering from her psychotic episodes.

40. Plaintiff eventually got back in bed and Mr. Lee left her alone in her room that night.

41. The next morning, Mr. Lee told Plaintiff that they should make a pornographic movie together.

42. Lee continued to get Plaintiff in the kitchen, grind his groin into her and grab her.

43. Lee told Plaintiff that he wanted her telephone number so he could take care of her "pussy" when she got out of the facility.

44. Mr. Lee also told Plaintiff he would get her out of the facility early and take care of her "pussy."

45. Plaintiff tried to seclude herself as much as possible in her own room to avoid further encounters with Mr. Lee.

46. Eventually, around August 17, 2021, Plaintiff spoke to another social worker, whom Plaintiff believes is named Melissa, about what happened with Mr. Lee and Plaintiff told Melissa that she wanted Mr. Lee to stop sexually harassing her.

47. Plaintiff also told Melissa that she wanted to speak to Mr. Lee's supervisor, Ms. Leigh.

48. Ms. Leigh met with Plaintiff and Plaintiff told Ms. Leigh that Mr. Lee had sexually abused her and taken advantage of her.

49.    Ms. Leigh told Plaintiff she wished Plaintiff had not told her what Mr. Lee had done to her because now she had to report him, and Mr. Lee would lose his license.

50.    Ms. Leigh also threatened Plaintiff that she would keep her in the facility longer.

51.    Shelia Hurley, the Director of CED Mental Health, came to the White/Parker facility where Plaintiff was housed for mental health treatment and questioned Plaintiff about the sexual assault she had reported.

52.    Director Hurley also spoke to others in the facility about Mr. Lee and about the sexual assault on Plaintiff, and then she fired Mr. Lee.

53.    Around August 20, 2021, the Cherokee County Sheriff's office received a report from DHR concerning a sexual incident at the White-Parker facility where Plaintiff was housed.

54.    Investigator Green met with Plaintiff and DHR about the incident and created an Incident/Offense Report.

55.    Investigator Green contacted Director Hurley, and Director Hurley told Investigator Green that Mr. Lee had been interviewed and that she had fired him due to his actions.

56.    Hurley also told Investigator Green that Mr. Lee was not a licensed therapist with the State of Alabama.

57.   Plaintiff originally told Investigator Green or the DHR official that she did not want to press charges against Mr. Lee because she thought Mrs. Leigh would hold her longer at the facility, and Plaintiff wanted out of there.

58.   Mr. Lee subsequently met with Investigator Green at the Cherokee County Sheriff's Office.

59.   Mr. Lee did not deny having a sexual encounter with Plaintiff, whom he was counseling; rather, he claims the sexual encounter where she performed oral sex on him was consensual.

60.   Mr. Lee admitted to Investigator Green that he had engaged in "inappropriate talking" with Plaintiff as well as another resident of the facility.

61.   Mr. Lee claims that he started his rounds, saw Plaintiff's door was opened and walked into her room.

62.   Lee next claims in the report that when he walked into Plaintiff's room she said to him "you know you want this" and she got out of her bed and removed her clothes.

63.   Lee then admits that Plaintiff then performed oral sex on him.

64.   Lee claims he told Plaintiff to stop the oral sex on him and she then turned around and was "grinding on him."

65.   Lee then claims he left Plaintiff's room.

66.     The sexual harassment Plaintiff endured interfered with Plaintiff's use and enjoyment of the premises at which she resided.

67.     The sexual harassment Plaintiff endured was sufficiently severe or pervasive to alter the conditions of the housing arrangement.

## V.     COUNT I – VIOLATIONS OF THE FAIR HOUSING ACT 42 U.S.C. §§ 3604(b), 3617 – SEX

68.     Plaintiff is an "aggrieved persons" as is defined by the Fair Housing Act.

69.     Defendants meet the requirements as set forth in 42 U.S.C. §3603 and are therefore subject to suit for their unlawful conduct.

70.     Defendants engaged in sexually harassing conduct towards Plaintiff, constituting sex discrimination under the Fair Housing Act.

71.     Defendants' unlawful conduct violated 42 U.S.C. §§ 3604 (b) and 3617.

72.     The FHA provides that "it shall be unlawful . . . (t)o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of . . . sex . . ." 42 U.S.C. § 3604(b).

73.     The FHA also makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . .

11

3604[.]" 42 U.S.C. § 3617.

74.   The FHA defines a "dwelling" as any building, structure, or portion thereof which

is occupied as, or designed or intended for occupancy as, a residence by one or

more families, and any vacant land which is offered for sale or lease for the

construction or location thereon of any such building, structure, or portion thereof.

42 U.S.C.S. § 3602(b); 24 C.F.R. § 100.20(b)

75.   Group homes or treatment centers or mental health facilities such as the facility

where Plaintiff resided are "dwellings" under 42 U.S.C.S. § 3602(b).

76.   "Threatening, intimidating or interfering with persons in their enjoyment of a

dwelling because of . . . sex. . . of such persons" is prohibited by Section 3617. 24

C.F.R. § 100.400(c)(2).

77.   Because of discriminatory animus towards Plaintiff, Defendants "interfered" with

the Plaintiff's enjoyment of her § 3604 rights to live in an environment free from

sexual harassment  or "coerced" or "intimidated" the Plaintiff  on account of her

having exercised those rights in asking to live in an environment free from sexual

harassment.

78.   When Defendants threatened to keep Plaintiff longer at the facility, Defendants

violated § 3617, whether Defendants kept Plaintiff longer or not.

79.   Plaintiff was subjected to sexual harassment and discriminatory conduct on the

basis of sex by Defendants.

80.   Plaintiff was sexually harassed and discriminated against by Defendants.

81.   The harassment was unwelcomed and based on sex. The harassment included sexually inappropriate comments, propositions, touching, and forced sex.

82.   Defendants subjected Plaintiff to a sexually hostile environment by subjecting her to unwanted conduct that was sufficiently severe or pervasive to alter the terms of her living arrangement with Defendants.

83.   The sexual harassment Plaintiff endured interfered with Plaintiff's use and enjoyment of the premises at which she resided, as Plaintiff should feel secure in her dwelling, but she did not feel secure.

84.   The sexually hostile environment was objectively and subjectively hostile and abusive because a reasonable person would find the housing environment endured by Plaintiff hostile and abusive, Plaintiff perceived the environment to be hostile and abusive, and the harassment negatively impacted Plaintiff's living arrangement by making it more difficult to reside at Defendant.

85.   Plaintiff subjectively perceived the sexually harassing treatment she endured to be hostile and abusive, and such conduct actually negatively impacted the conditions of her residential arrangement.

86.   Plaintiff experienced *quid pro quo* harassment because Plaintiff made Defendants

aware of the fact that the social worker offered to get plaintiff out of the facility early if she engaged in sexual conduct with him.

87. Defendants have a pattern and practice of discriminatory and harassing conduct towards its female residents.

88. Defendants failed to guard against the misconduct of its employees, failed to train their managers and employees, failed to monitor their performance and conduct and failed to take adequate remedial action.

89. Defendants had no effective sexual harassment policies protecting its residents and no effective procedures for handling complaints of sexual harassment of its residents.

90. Defendants were made aware of this hostile and abusive environment, and continuously refused to take appropriate remedial action.

91. Defendants ratified and/or condoned such hostile and abusive behavior by failing to take appropriate action.

92. Defendants are directly and vicariously liable for the conduct of its employees that amounted to the sexual harassment suffered by Plaintiff.

93. The sexually harassing conduct towards Plaintiff, and Defendants' ratification of such conduct, adversely affected Plaintiff's residential living arrangement because it unreasonably interfered with Plaintiff's living arrangement to such an extent

that it made it more difficult for Plaintiff to do obtain the services she was there to receive at the facility.

94. Defendants, by and through its agent, engaged in the practices complained of herein with malice and/or with reckless indifference to Plaintiff's federally protected rights.

95. Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for backpay, declaratory judgment, injunctive relief, and compensatory and punitive damages is her only means of securing adequate relief.

96. Plaintiff is now suffering, and will continue to suffer irreparable injury from Defendants' unlawful conduct as set forth herein unless enjoined by this Court.

**COUNT II – INVASION OF PRIVACY**

97. Defendant, through the acts of its agents, invaded the privacy of Plaintiff, by, among other things, intruding into Plaintiff's private seclusion by making sexual comments and inquiries and by sexually assaulting her.

98. Defendants authorized, ratified and/or condoned its agents' actions which amounted to an invasion of Plaintiff's privacy.

99. Defendants engaged in the practices complained of herein with malice and/or with reckless indifference to Plaintiff's rights.

## COUNT III – ASSAULT AND BATTERY

100.   Plaintiff was subjected to unwanted touchings of a sexual nature.

101.   Defendants ratified and/or condoned its agents' actions which amounted to assault

and battery of Plaintiff.

102.   Defendants engaged in the practices complained of herein with malice and/or with

reckless indifference to Plaintiff's rights.

## COUNT IV - NEGLIGENT AND/OR WANTON HIRING, SUPERVISION, TRAINING, AND/OR RETENTION.

103.   This is a claim arising under the law of the State of Alabama to redress the

negligent and/or wanton, hiring, supervision, training, and retention of the

supervisor who committed the sexually harassing acts against the Plaintiff,

including unwanted touchings, invasion of privacy, and assault and battery in

violation of the common law of the State of Alabama.

104.   Defendants negligently and/or wantonly failed to adequately hire, supervise, train,

and/or negligently retained, its agents or employees which proximately caused the

sexually harassing acts against the Plaintiff, including the above-described

unwanted touchings, invasion of privacy, and assault and battery in violation of

the common law of the State of Alabama Plaintiff.

## COUNT V – OUTRAGE

105.   Defendants, by and through its agents and through its own indifference to sexual

harassment, outrageously and intentionally inflicted emotional distress upon plaintiff by subjecting him to abusive and harmful sexual misconduct which was ratified and condoned by Defendant.

106. Defendants and its agents caused Plaintiff severe emotional distress by such sexual misconduct, beyond what any individual should be expected to endure. Plaintiff's emotional distress was the foreseeable result of Defendants' actions and inactions as set forth above.

107. The conduct described above was extreme, outrageous, and beyond the boundaries of decency in a civilized society and caused Plaintiff to suffer severe emotional distress.

108. Defendants engaged in the practices complained of herein with malice and/or with reckless indifference to Plaintiff's rights.

## VI.   DAMAGES

109. Plaintiff is now suffering, and will continue to suffer irreparable injury from Defendants' unlawful conduct as set forth herein unless enjoined by this Court.

110. Plaintiff has suffered embarrassment, humiliation, shame, damage to reputation, mental distress, emotional and physical pain and anguish and other pecuniary losses as a consequence of Defendants's unlawful conduct.

111. Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs

alleged herein and this suit for backpay, declaratory judgment, injunctive relief, and compensatory and punitive damages is her only means of securing adequate relief.

## VII.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1. Issue a declaratory judgment that the employment policies, practices, procedures, conditions and customs of Defendants are violative of the rights of Plaintiff as secured by the FHA.

2. Grant Plaintiff a permanent injunction enjoining Defendant, its agents, successors, employees, attorneys and those acting in concert with Defendants and at Defendants's request from continuing to violate the FHA.

3. Enter an Order requiring Defendants and to make Plaintiff whole by ordering Defendants to award Plaintiff compensatory, punitive,/or nominal damages.

4. Plaintiff further prays for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorney's fees and expenses and post judgment interest in accordance with 42 U.S.C. § 3613; and,

**Plaintiff Demands a Trial by Struck Jury on All Issues Triable by a Jury.**

Respectfully submitted,

/s/ Jon C. Goldfarb
Jon C. Goldfarb asb-5401-f58j
L. William Smith asb-8660-a61s
Christina M. Malmat asb-1214-y44q
Lieselotte Carmen-Burks asb-8304-t46e
Counsel for Plaintiff

**OF COUNSEL:**
WIGGINS, CHILDS, PANTAZIS, FISHER,
& GOLDFARB, LLC.
301 19th Street North
Birmingham, Alabama 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500